UNITED STATES of America ex rel.
David GALVAN, Petitioner,

v.

Richard DeROBERTIS, Respondent.

No. 80 C 2233.

United States District Court,
N. D. Illinois, E. D.

Dec. 31, 1981.

Robert M. Stephenson, Cotsirilos & Crowley, Chicago, Ill., for petitioner.

Carolyn B. Notkoff, Asst. Atty. Gen., State of Ill., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

David Galvan ("Galvan"), an inmate at Stateville Penitentiary serving an eight to twenty year sentence for rape, petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254, claiming his conviction was constitutionally deficient in six separate respects. Stateville Warden Richard DeRobertis ("DeRobertis") has moved for summary judgment on alternative grounds that (1) Galvan has failed to exhaust administrative remedies as to some of his claims and waived his right to relief on others or (2) Galvan's claims are substantively insufficient to entitle him to relief. Galvan has filed a cross-motion for summary judgment. For the reasons stated in this memorandum opinion and order Galvan's motion for summary judgment is denied and DeRobertis' motion is granted.

### Procedural History

In November 1969 Galvan was convicted in the Circuit Court of Cook County of rape and conspiracy to commit aggravated kidnapping. On appeal his sole claim was that the trial judge had failed specifically to instruct the jury that the State's rebuttal testimony was to be considered only against Galvan's co-defendant Augustine Soto ("Soto") and not against Galvan. On its own motion the Court reversed Galvan's conviction on the conspiracy charge but affirmed the rape conviction. *People v. Galvan*, 42 Ill.App.3d 390, 1 Ill.Dec. 139, 356 N.E.2d 139 (1st Dist. 1976). Galvan took no further appeal.

On May 6, 1980 Galvan filed his habeas corpus petition with this Court. As amended the Petition [1] alleges six grounds for relief:

(1) Pretrial identification of Galvan by rape victim Judy Wisner ("Wisner") was impermissibly suggestive and unreliable.

(2) Galvan was denied his right to have counsel present at that identification.

(3) Galvan was tried and convicted as an adult rather than as a juvenile for offenses he allegedly committed as a minor, without first being afforded a hearing on that question before a judicial officer.

(4) By refusing to exclude certain hearsay evidence (the "hearsay testimony") introduced by the prosecution during rebuttal and surrebuttal pertaining to Soto, the trial court denied Galvan a fair trial.

1. Galvan has twice been granted leave to amend his petition. All references to the "Petition" are to the Second Amended Petition filed January 7, 1981.

(5) Galvan's right to confront adverse witnesses was also denied by the trial court's refusal to exclude the hearsay testimony.

(6) Galvan was denied a fair trial because the trial court denied his motion for a mistrial (based on the admission of the hearsay testimony) or alternatively for a severance from Soto.

*Facts Underlying Galvan's Conviction*

On July 21, 1969, 17 year old Wisner was raped by a group of "Latin, Puerto Rican or Mexican" men in the basement of a building at 27th and Normal Avenues in Chicago. Wisner had been accosted by two of the men in a blue Pontiac Firebird while she was waiting for a bus near Archer and Western Avenues. They forced Wisner into the car with a knife, told her they were members of the Latin Kings and took her to the Normal Avenue basement. When she entered six other men were waiting in a room illuminated only briefly by a single light bulb. Each man raped Wisner, including the "shortest man present" who had originally held her shoulders down during the ordeal. She was then released and escorted to Archer and Halsted Streets by the two men who had driven the Pontiac. Wisner immediately reported the rape to the police.

On the following day Wisner observed, in the area from which she had been taken, what she believed to be the Pontiac her assailants had driven. She identified the driver as the same driver and reported the license plate number to the police. Later the same day police saw the automobile, stopped it and placed its four occupants—Soto, Galvan (then 16 years old), Anthony Barrera ("Barrera") and David Lara ("Lara")—under arrest. After being booked on charges of rape at the police station the four men were transported to Little Company of Mary Hospital, where Wisner had been admitted. Police officers brought Wisner into a room in which the four men had been placed. Wisner identified Soto and Barrera as the driver and passenger in the Pontiac and Galvan as the

"shortest man" who had held her shoulders. She was uncertain whether Lara had been among the men.

On October 2, 1969 Galvan (then 17 years old), Soto and Barrera were indicted on a number of charges: rape (all defendants), aggravated kidnapping (Soto and Barrera), aggravated assault (Barrera) and conspiracy to commit aggravated kidnapping (all defendants). Before trial Galvan moved to suppress the hospital identification on the grounds that (1) he was arrested without probable cause, (2) he was denied representation by counsel at the identification and (3) the identification was impermissibly suggestive. Galvan's motion was denied and the trial proceeded. Wisner identified Galvan as the man who had held her shoulders in the basement, though she admitted the single light bulb had only twice illuminated—dimly and briefly—the basement room during the ordeal.

Galvan and Barrera presented alibis in defense. Soto testified he had in fact given Wisner a ride on the night of July 21 but had dropped her off in the vicinity of her home. In support of that contention Soto called Victor Rodriquez ("Rodriquez"), who testified that Soto's story was accurate. In rebuttal the State introduced evidence discrediting Rodriquez, who then admitted he had perjured himself. Rodriquez claimed he had done so because Soto's father had requested it and Rodriquez was fearful of possible harm to himself or his family. Soto's lawyer countered with testimony suggesting Rodriquez had been coerced into changing his own testimony. Cross-examination revealed that Soto, Barrera and Galvan had been under investigation by a special unit of the State's Attorney's Office monitoring street gang activity and that all were suspected of being members of the Latin Kings gang.

During rebuttal and surrebuttal, devoted almost exclusively to discrediting Soto, Galvan's attorney objected on several occasions to the introduction of hearsay. Each objection was denied. Counsel also requested that contemporaneously with the testimony the jury be instructed that the discrediting

evidence pertained only to Soto. That request was also denied, with the judge instead giving a general instruction at the conclusion of the evidence:

You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to him. Any evidence which was limited to one defendant should not be considered by you as to any other defendant.

Finally Galvan's attorney moved for a mistrial or alternatively a severance on the ground that the impeachment of Soto impermissibly permeated the entire trial. That motion was also denied. All defendants were convicted.

### Exhaustion and Waiver Contentions

En route to a consideration of Galvan's substantive contentions DeRobertis makes two procedural claims that, if upheld, would bar further inquiry into Galvan's case:

(1) Galvan's complaint that he was improperly tried as an adult may be addressed by a petition filed under the Illinois Habeas Corpus Act, Ill.Rev.Stat. ch. 65.

(2) Galvan's other complaints are cognizable under the Illinois Post-Conviction Act, Ill.Rev.Stat. ch. 38, §§ 122–1 to 122–7.

Because those state court remedies are still available to Galvan, DeRobertis contends, 28 U.S.C. § 2254(c) requires Galvan to pursue those options before coming into federal court.

■ As to the state Habeas Corpus Act DeRobertis points to the provision (Ill.Rev. Stat. ch. 65, § 22(1)) that makes the remedy available when the trial court lacked *jurisdiction. See also People ex rel. Sheffield v. Twomey*, 14 Ill.App.3d 264, 266, 302 N.E.2d 439, 440 (1st Dist. 1973). But the short answer is that Galvan's claim is not so stated. Galvan rather asserts (Br. 24) a denial of due process because the 1969 Illinois statute that subjected him to prosecution as an adult, Ill.Rev.Stat. ch. 37, § 702–7 (1969), was based solely upon a State's Attorney's "unbridled discretion." Acceptance of that proposition would not oust the trial court of jurisdiction over Galvan's person or over the subject matter of the action. Thus the Illinois Habeas Corpus Act cannot provide relief to Galvan, either on his "juvenile status" claim or any other.

■ Nor would a proceeding under the Illinois Post-Conviction Act be of any avail to Galvan. Illinois law (*People v. James*, 46 Ill.2d 71, 263 N.E.2d 5 (1970)) holds a judgment on direct appeal to be (1) res judicata as to all issues presented to the reviewing court and (b) a waiver as to all issues that could have been but were not raised on appeal. That rule effectively eviscerates the statutory post-conviction remedy for prisoners who like Galvan have appealed their convictions.

In light of the Illinois case law, our Court of Appeals held in *United States ex rel. Williams v. Brantley*, 502 F.2d 1383, 1385–86 (7th Cir. 1974) that an Illinois prisoner who had appealed his conviction in state court need not pursue his remedies under the state statute, absent authority suggesting that the stringent Illinois rule might be waived in particular kinds of cases under the "fundamental fairness" exception. DeRobertis' counsel has not suggested any hint in the cases that Illinois courts would apply the "fundamental fairness" exception to allow consideration of any of Galvan's substantive contentions.[2]

Galvan's second major procedural argument invokes the Supreme Court's decision in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). But *Wainwright* held only that federal habeas will not normally lie as to issues on which the petitioner failed to make timely objec-

---

**2.** *Williams* does not apply where habeas review is sought for any issue that "arises from facts wholly within the record." *Id.* at 1385. For that reason Galvan's earlier petition, which embraced claims of ineffective assistance of counsel, might have been cognizable under the Illinois post-conviction statute and thus not ripe for review in this Court at this time. But Galvan has dropped those claims in the Petition. All his remaining complaints arise from facts wholly within the trial court record, thus bringing *Williams* into play.

tion at his state court *trial.* That ruling must be read against the background of *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). *Fay* decided that a failure to *appeal* certain issues from a state court conviction did *not* bar consideration of those issues on federal habeas corpus, at least where the failure to appeal was not a "deliberate by-pass" of the right involved (372 U.S. at 439, 83 S.Ct. at 849, citing and quoting from *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) ["intentional relinquishment or abandonment of a known right or privilege" constitutes waiver]).

*Wainwright* did not overrule *Fay,* although Justice Rehnquist's *Wainwright* approach must give a District Judge pause when considering *Fay's* vitality, if not its viability. *Wainwright* was based expressly on the familiar principle that an adequate and independent state procedural ground for decision bars review of otherwise cognizable federal habeas claims, citing such precedents as *Fox Film Corp. v. Muller,* 296 U.S. 207, 56 S.Ct. 183, 80 L.Ed. 158 (1935) and *Murdock v. Memphis,* 20 Wall. 590, 22 L.Ed. 429 (1875). But *Wainwright* explicitly left unaddressed (433 U.S. at 88 n.12, 97 S.Ct. at 2507 n.12) any principled distinction between (1) failure to object under a state's contemporaneous objection rule at *trial* (normally an adequate ground for purposes of the doctrine) and (2) failure to *appeal* the denial of that objection (generally *not* adequate).

*Wainwright,* 433 U.S. at 89, 90, 97 S.Ct. at 2508, did implicitly suggest a basis for reconciling the decision in *Fay:*

> We think that the rule of *Fay v. Noia,* broadly stated, may encourage "sandbagging" on the part of defense lawyers, who may take their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims

in a federal habeas court if their initial gamble does not pay off....

> ...The failure of the federal habeas courts generally to require compliance with a contemporaneous objection rule tends to detract from the perception of the trial in a criminal case in state court as a decisive and portentous event.

In light of that language this Court reads *Wainwright* as resting in part on an appreciation of the uniqueness of the state trial court's position in criminal cases. That court is the fact-finder, the forum to which society commits the primary—and in practice, often the exclusive—responsibility for deciding who shall be found guilty and who shall go free.

*Wainwright,* 433 U.S. at 89–90, 97 S.Ct. at 2508, also relied on the diminished attentiveness of state appellate courts to constitutional issues under the *Fay* rule:

> The refusal of federal habeas courts to honor contemporaneous-objection rules may also make state courts themselves less stringent in their enforcement. Under the rule of *Fay v. Noia,* state appellate courts know that a federal constitutional issue raised for the first time in the proceeding before them may well be decided in any event by a federal *habeas* tribunal. Thus, their choice is between addressing the issue notwithstanding the petitioner's failure to timely object, or else face the prospect that the federal habeas court will decide the question without the benefit of their views.

By definition that choice is not involved where an issue is not tendered to the state appellate court at all.

Thus a two-fold rationale may explain why *Wainwright* did not overrule *Fay.* Those decisions can coexist in their own spheres. *Accord: Crick v. Smith,* 650 F.2d 860, 867–68 (6th Cir. 1981); *White v. Sowders,* 644 F.2d 1177, 1181–83 (6th Cir. 1980).[3]

---

**3.** Indeed the narrower rationale underlying *Wainwright*—the discouragement of "sandbagging" by defense lawyers—is not at all applicable to failure to appeal. Sandbagging involves a gamble by a defense lawyer that he or she can win at trial even without making the federal law objections. If contemporaneous objec-

tion rules like the one at issue in *Wainwright* were ignored by the federal habeas court, the defendant could conceivably get two separate chances at "trial," one before the state court and another involving legal objections never raised before the state trial court but decided for the first time by the federal habeas court.

*But see Cole v. Stevenson*, 620 F.2d 1055, 1058–59 (4th Cir. 1980).

■ Because Galvan did raise in the trial court each issue now posed in his habeas petition, this Court holds that the waiver rule of *Fay* rather than *Wainwright* applies here. That brings into play *Fay's* "deliberate by-pass" rule, 372 U.S. at 438, 83 S.Ct. at 849:[4]

> . . .the federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies.

As for the definition of "deliberate by-pass" the Supreme Court stated, *id.* at 439, 83 S.Ct. at 849:

> If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits.

■ There is no showing of a "deliberate by-pass" by Galvan for strategic or other reasons. DeRobertis argues (Mar. 19, 1981 brief at 6), "Nothing in [Galvan's] petition indicates that he did not knowingly and understandingly waive these federal claims." That however puts the shoe on the wrong foot, effectively advancing the *Wainwright* cause-and-prejudice analysis. *Fay* allows a district judge to exercise discretion *if* he or she makes a factual finding of a "deliberate by-pass." It clearly contemplates that no such waiver may be as-

sumed in the absence of any evidence concerning the question. No such evidence has been produced.

For that reason DeRobertis' waiver argument cannot prevail. This opinion must therefore move on to consideration of Galvan's substantive complaints.

## Pretrial Identification

Galvan claims Wisner's pretrial identification was impermissibly suggestive and unreliable, and thus a violation of Galvan's due process rights under such cases as *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972) and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). That claim involves a two-step inquiry, whose first phase examines the degree of suggestiveness involved in the identification procedure and whose second looks at ultimate reliability. *Manson*, 432 U.S. at 106, 97 S.Ct. at 2249; *Neil*, 409 U.S. at 199, 93 S.Ct. at 382: ("We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive"—suggestiveness alone is not fatal).

■ Here the first step is a short one, for the procedure employed by the police was clearly "suggestive" in any sense of that word. They transported Galvan and the other three arrestees to the hospital after "booking" them at the police station. All four were suspected of the crime—none of them was a "filler," essential to a valid police line-up. *Sanchell v. Parratt*, 530 F.2d 286, 294–95 n.6 (8th Cir. 1976). Moreover Wisner was *informed* before she entered the room that the men were "suspects." Presentation of four Latin males to Wisner under the circumstances, as Galvan argues,

By contrast, failing to *appeal* rulings properly objected to at trial involves no such denigration of what ought to be the "main event" to a "tryout on the road," *Wainwright*, 433 U.S. at 90, 97 S.Ct. at 2508, because defense lawyers ordinarily gain nothing from the failure to appeal. That is precisely why *Fay* was predicated

on extraordinary issues, where failure to appeal was a purposeful decision.

4. If the survival of *Fay* is to have any meaning at all, its "deliberate by-pass" rather than the "cause-and-prejudice" rule must retain vitality. *Wainwright*, 433 U.S. at 88 n.12, 97 S.Ct. 2507 n.12.

"amounted to an invitation to make an identification."[5]

That does not however end the inquiry, which then turns to the second issue of reliability. After the *Neil* opinion had stated the rule already quoted, the Court went on to list five factors to consider in evaluating the likelihood of misidentification. In *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253, the Court repeated and applied those five factors set out in *Neil*, then emphasized that where the confrontation was suggestive "*reliability* is the linchpin in determining the admissibility of identification testimony . . ."

■ First among the *Neil/Manson* factors is the witness' opportunity to view the criminal at the time of the crime. Wisner had such an opportunity (though fleeting). Although the lighting was both dim and short in duration, as chance had it one of the two times the light bulb *was* turned on occurred during the rape by the man Wisner identified as Galvan.

Second, and in this case closely related, is the witness' degree of attention to the criminal. Given an opportunity for observation, a rape victim's attention to her attacker can surely be assumed to be extraordinary. In this case the conclusion is corroborated by Wisner's ability to correlate the shortest of her attackers, the one who had held her shoulders, with the one who was raping her when the light bulb went on a second time.

As to the third factor, the accuracy of the witness' prior description, Wisner had previously spoken of the "shortest man present" who had held her shoulders during the rape, and she had provided other descriptive features. Galvan *was* the shortest man present in the show-up at the hospital, and he fitted the balance of the general description. Wisner's reliability was further augmented by her positive identification, on the afternoon of July 22, of the car, driver and passenger as those involved in her abduction the night before, and reconfirmation of the identification at the hospital that night. Moreover, Wisner also appeared to be able to separate wheat from chaff: She did *not* positively identify all the men in the hospital room as her attackers, but exempted Lara from the same degree of certainty.

Finally, there is no suggestion that Wisner exhibited less than certainty at the hospital identification (the fourth factor), and only about 24 hours elapsed between the rape and the identification (the fifth). In sum, each of the five *Neil/Manson* factors indicates Wisner's reliability to a greater or lesser degree.

Analysis of the "totality of the circumstances" (*Neil*, 409 U.S. at 199, 93 S.Ct. 382), which is perhaps a more impressionistic way of dealing with the relevant factors, leads this Court to the same conclusion. It cannot find that the jury, with its opportunity to judge credibility, was wrong in believing Wisner. Though the confrontation procedure *was* suggestive, there are enough other indicia of reliability to hold independently that Wisner's identification at the hospital was reliable. Under the cases that requires a holding in favor of DeRobertis. *Neil*, 409 U.S. at 199–200, 93 S.Ct. at 382–383; *Sanchell v. Parratt*, 530 F.2d at 293.

### *Absence of Counsel During Pretrial Identification*

Under *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 22 L.Ed.2d 411 (1976), the Sixth Amendment right to counsel [6] attaches only to corporeal identifications conducted "at or after the initiation of adversary criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." In *Kirby* the Court upheld the admission into evidence of a pretrial identification much like Wisner's—a robbery victim's one-on-

---

5. This conclusion is not altered by the fact that Wisner was less positive as to Lara than as to the others (including Galvan). That fact does however bear on reliability, next discussed in the text.

6. As is customary in these cases, this opinion will refer directly to Bill of Rights provisions, though in the strict sense all Galvan's claims rest on the Fourteenth Amendment's Due Process Clause and its judicial incorporation of the Bill of Rights.

one stationhouse identification of an uncounseled suspect shortly after the suspect's arrest.

■ *Moore v. Illinois*, 434 U.S. 220, 227–28, 98 S.Ct. 458, 464–465, 54 L.Ed.2d 424 (1977), requires no different conclusion. There the Court held the initiation of "adversary criminal proceedings" included the state's proceeding formally by way of preliminary hearing—a result foreshadowed by the quoted language in *Kirby*. But no case has extended the right-to-counsel protection of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and its progeny to the mere arrest and booking of a suspect (*Moore* spoke of the time "the government ha[d] committed itself to prosecute"—scarcely descriptive of an arrest). Galvan had no right to counsel at the hospital identification.

### Trial Court's Refusal To Exclude Testimony and Grant a Severance to Galvan

■ As stated in the "Facts" section, the trial court permitted extensive testimony discrediting co-defendant Soto. Galvan contends that testimony violated his due process rights—that he was "prejudiced to a degree that denied him fundamental fairness in his trial." *United States ex rel. Harris v. Illinois*, 457 F.2d 191, 199 (7th Cir. 1972); *see also United States ex rel. Bibbs v. Twomey*, 506 F.2d 1220, 1223 (7th Cir. 1974). That argument does not succeed.

■ As an initial matter, the trial judge's rulings on almost all evidentiary issues were proper as a matter of state law, and were upheld on appeal. *People v. Galvan*, 42 Ill.App.3d 390, 394–96, 1 Ill.Dec. 139, 142–143, 356 N.E.2d 139, 142–43 (1st Dist. 1976). *Soto* was fatally damaged by prosecution evidence that his alibi witness had perjured himself because of threats by Soto. That evidence was certainly admissible *as to Soto* because he had chosen to testify, opening up his credibility as an issue in the

trial. But none of the rebuttal testimony implicated Galvan in the perjury of Soto's alibi witness.

Indeed Galvan's name was mentioned only once during the extended interrogation by the prosecution and Soto's counsel. Richard Jalovec, an Assistant State's Attorney assigned to the Special Prosecutions Unit of that office, testified as to an interview with Rodriquez, Soto's alibi witness, during which Rodriquez admitted to having lied about Soto's alibi. On cross-examination by Soto's attorney, Jalovec testified that he monitored street gang activity in Chicago and that he had evidence that Soto, Barrera and Galvan were members of the Latin Kings gang. Galvan points to the other trial evidence linking the Latin Kings to the offense, urging that the improperly drawn connection between Galvan and the gang was so prejudicial· as to deny him fundamental fairness.

■ It is true that Jalovec should not have been permitted to testify as to either Barrera's or Galvan's gang activities as a matter of state law. He should have been limited to the issue of Soto's alibi and credibility. But it is doubtful that this single mistake by the trial judge would have justified reversal on *state law* grounds, given the substantial amount of evidence specifically inculpating Galvan. And Galvan does not meet the much heavier burden of showing that "fundamental fairness" was violated by a single error of the sort present here. Finally, the limiting jury instruction the trial judge gave—though perhaps inadequate from one viewpoint—did contribute toward eradicating whatever prejudicial effect Jalovec's slip had as an original matter.

Galvan's argument that "fundamental fairness" was violated by the trial judge's refusal to order a mistrial or severance after the testimony as to Soto's credibility is equally unsuccessful.[7] All .except Jalovec's

---

7. Galvan's cited cases demonstrate the weakness of his position. Thus in *United States v. Truslow*, 530 F.2d 257, 259–60 (4th Cir. 1975), the court held the Sixth Amendment's Confrontation Clause—*not* due process—offended by

post-conspiracy hearsay testimony offered against one co-conspirator and directly implicating his co-conspirator. Galvan raises no Confrontation Clause argument; here the speaker, Jalovec, was present and testified and

misstep was admissible under state law. This record does not present the sort of "well-poisoning" necessary to find a due process violation.

### Trial of Galvan as an Adult

Galvan finally argues his Fourteenth Amendment due process and equal protection rights were violated by his trial and conviction as an adult without a prior hearing before a neutral judicial officer on his status as a juvenile. Galvan also asserts that his indictment *before* the State's Attorney filed a motion with the juvenile court, as required by statute, made · his transfer from juvenile to adult status a fait accompli and thus violated due process. Neither contention can prevail.

Any discussion of the constitutionality of juvenile transfer procedures in this Circuit begins with *United States ex rel. Bombacino v. Bensinger*, 498 F.2d 875, 877 (7th Cir. 1974), where then-Judge John Paul Stevens stated:

> . . . the transfer proceeding is of such critical importance to the juvenile that any fundamental procedural unfairness in that proceeding will require a subsequent conviction to be set aside.

Application of that standard has not been stringent. ·In *Bombacino* itself the Court held the dual absence of an evidentiary hearing and of a statement of the judge's reasons for his opinion was not enough to invalidate the procedure on due process grounds. Later in *United States ex rel. Pedrosa v. Sielaff*, 598 F.2d 1064 (7th Cir. 1979), the Court held that due process imposed no higher standards for the exercise of a juvenile court judge's discretion than the very general ones contained in the transfer statute's preamble. Indeed Judge Stevens in *Bombacino* stated in dictum, "There is respectable authority for the view that the determination may be committed entirely to the discretion of the prosecutor."

That dictum, if elevated to a holding, meets Galvan's entire due process contention head on. Moreover it is highly relevant that Galvan has offered nothing to indicate that his counsel requested but was denied a hearing. In *Bombacino* the petitioner offered no evidence, and his claim that the lack of an evidentiary hearing violated due process was therefore found wanting. This Court cannot read into the Due Process Clause a requirement that a hearing *always* be provided, even when not requested by the juvenile's counsel. Under *Bombacino* due process seems well satisfied by a prosecutor's transfer decision susceptible to approval by the juvenile court judge based on the statute's broad purposes. If the juvenile—represented by counsel as was Galvan—wishes a hearing as to the appropriateness of transfer, he has that right.

It is immaterial that Galvan's indictment preceded the transfer from juvenile to adult status. At that time the statute, Ill.Rev.Stat. ch. 37, § 702–7 (1969), contemplated the State's Attorney's filing a petition in the Juvenile Court alleging a commission of a crime. Then or thereafter the juvenile judge could object to the removal of the case from his jurisdiction, and the Chief Judge of the Circuit Court was to decide the matter.

It may be that the statute contemplated the prosecutor's staying his hand pending action by the juvenile court judge. That is hardly clear as a statutory matter, for the act neither prescribed its sequence in terms of indictment nor set any time limit within which the juvenile court judge might object. If the *statute* does not mandate the sequence, it is farfetched to assert that *due process* requires juvenile court approval to *precede* indictment in every case. We can-

---

*was* cross-examined. Availability of the witness to cross-examination distinguishes this case from Confrontation Clause cases like *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Similarly inapposite are other cases Galvan relies on, all holding severance appropriate under Fed.R.Crim.P. 14 with no discussion of due process: *Flores v. United States*, 379 F.2d 905 (5th Cir. 1967); *United States v. Donaway*, 447 F.2d 940 (9th Cir. 1971) and *Castro v. United States*, 296 F.2d 540 (5th Cir. 1961). While all Galvan's cited authority involves the inappropriateness of comparable testimony, none was decided under the restrictive "fundamental fairness" standard of the Due Process Clause.

not presume that the juvenile court judge would permit his discretion to be foreclosed by the fact of indictment.

### Conclusion

This Court determines that no evidentiary hearing is required (Rule 8(a) following 28 U.S.C. § 2254). Although the Federal Rules of Civil Procedure are not fully applicable to habeas proceedings (Rule 11, *id.*), the situation here is akin to that under Fed.R.Civ.P. 56 where there is no genuine issue as to any material fact and DeRobertis is entitled to judgment as a matter of law. This Court denies Galvan's petition for a writ of habeas corpus.