**UNITED STATES of America,**
**Appellee,**

v.

**Percy DAILEY, Jr., Appellant.**

**No. 75–1213.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 9, 1975.

Decided Oct. 22, 1975.

As Revised Nov. 10, 1975.

---

Norman W. Pressman, St. Louis, Mo., for appellant.

Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This is a direct appeal from Percy Dailey Junior's conviction for attempted bank robbery with a dangerous weapon in violation of 18 U.S.C. § 2113(a) and (d). We find the cumulative effects of an impermissibly suggestive pretrial photographic display and improper final argument of government counsel deprived Dailey of a fair trial, and reverse.

Shortly before 9 a.m. on January 28, 1975, in Pine Lawn, Missouri, Mr. Lindewerth, an officer of the Pine Lawn Bank and Trust Company, was transferring cash, checks and food stamps from the bank's drive-in facility to the main bank located nearby. He was accompanied by Mr. Alphonse Geiben, a bank guard. Since it was raining heavily, the guard preceded Mr. Lindewerth to the bank and held the door open so Lindewerth could sprint across the forty feet of parking lot which separated the two buildings without getting too wet. As Mr. Lindewerth ran toward the open door with the deposits in his arms and his head down, he saw two figures approach out of the corner of his eye and

heard a man's voice demand the money. His momentum carried him on into the bank. Mr. Lindewerth could not identify or describe the would-be robbers; however, the bank guard, Mr. Geiben, who was holding the door, saw them approach and heard them demand the money. After Mr. Lindewerth ran into the bank, Mr. Geiben closed the door. The robbers fled, but no one saw in which direction. The police were called and Mr. Geiben gave a description of the two men to them. Based on the guard's report, a description of the suspects was broadcast over police radio. On the basis of this broadcast, Dailey was arrested near the bank shortly after the crime.

I. *Courtroom Identification.*

At trial Mr. Geiben positively identified Dailey as the gunman who had participated in the robbery attempt. Dailey was the only black man sitting before the bar when he was identified. Geiben stated this identification was based on his viewing the defendant for "no more than thirty seconds." He also testified he just got a glimpse of the two men as he stood inside the bank holding the door and the two men were outside. It was raining heavily, and part of the time his vision was obscured as Mr. Lindewerth ran past. The guard began to draw his gun, then slammed the door shut. Geiben stated that the gunman was black, about 26, five feet eight and 130 pounds. He testified that he told the police that the suspect wore a black hat, blue denim jacket, red and black shirt, and dark trousers. He went on to say he had seen Dailey being arrested as he was en route to the police station, and identified him

as the gunman at that time. He said he had a clear look at Dailey's face at the scene of the arrest.

Geiben identified photographs taken of Dailey on the day he was arrested, and stated the clothing pictured was similar to that the robber had worn. On cross-examination Geiben admitted that the Assistant United States Attorney had shown him the photographs of the defendant on the morning of trial, shortly before he took the stand. No other photographs were shown to him. He had never attended a lineup in connection with this robbery attempt.

Defense counsel introduced a statement signed by the witness Geiben eight days after the attempted robbery. The statement described the gunman as wearing a black hat and denim jacket, and stated he had never identified the gunman in a face to face confrontation or photograph. The statement indicated that the man who had the gun had worn neither a beard nor a mustache.[1]

After it was called to his attention that the black hat worn by Dailey when arrested bore a conspicuous feather, Mr. Geiben stated that he had also told the police that the hat worn by the robber had a feather. He testified he could not remember whether the robber's hat had a white or black band, but stated he had told the police it had a band. He testified that the gunman had a little mustache, and could not explain why he had stated the robber did not have a mustache eight days after the crime.

The evidence showed that, at the time he was arrested, Dailey was wearing a

---

1. The entire statement reads:

STATEMENT OF ALPHONSE GEIBEN

I, Alphonse Geiben, am a bank guard at the Pine Lawn Bank and Trust Company, Pine Lawn, Missouri. On the morning of January 28, 1975, two men attempted to rob our bank. One man held a gun. I described the man holding the gun to the Police Department after the attempted robbery. I described him as being 5' 8" tall and 140 pounds. I described him as wearing a black hat and a denim jacket. After the attempted robbery, and to this date, I have not identi-

fied this man in person in a face-to-face confrontation, nor have I identified a picture of him.

The man who held the gun in the attempted robbery did not have a beard and he did not have a mustache.

/s/ Alphonse Geiben
Alphonse Geiben

Witnessed by /s/ Norman Pressman
Norman Pressman

Signed this 5th day of February, 1975.
Defense Exhibit A.

black, red and green shirt, a blue suede jacket, blue jeans and a broad-brimmed black hat with black band and a feather. He had a conspicuous mustache and sideburns.

We have no trouble concluding that showing Dailey's photographs to the witness on the day he was to testify was impermissibly suggestive. By showing only Dailey's photograph to the witness, government counsel in effect said *"This is the man." Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Our court has previously noted that showing only a single suspect to the witness is "the most suggestive and, therefore, the most objectionable method of pretrial identification." *United States v. Cook,* 464 F.2d 251, 253 (8th Cir.), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 457, 34 L.Ed.2d 305 (1972). The witness also knew that the person pictured was awaiting trial for the robbery attempt. *United States v. Gambrill,* 146 U.S.App. D.C. 72, 449 F.2d 1148, 1153 (1971). The suggestiveness was exacerbated because the photographic display was a month and a half after the crime, and on the day of trial. Therefore the danger was great that the witness would remember the person in the photograph more readily than the appearance of the person who committed the crime. *United States v. Cook, supra,* 464 F.2d at 254. Nor was there any necessity that the photograph of Dailey be shown to the witness before trial. *See Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Even though the photographic display was impermissibly suggestive, it does not follow that the in-court identification was tainted by the invalid display. *United States v. Monteer,* 512 F.2d 1047, 1050 (8th Cir. 1975); *Cannon v. Sigler,* 460 F.2d 311, 312 (8th Cir. 1972). At trial Mr. Geiben stated that he was certain that Dailey was the gunman who

had committed the crime. If the identification in court was based on the witness' recollection of the gunman's appearance at the time of the attempted robbery, it would be admissible, because independent of the pretrial photographic display. *Evans v. Janing,* 489 F.2d 470, 474 (8th Cir. 1973). However, the witness' statement that his identification was based on observations made at the scene of the crime is not necessarily conclusive. *Marshall v. Rose,* 499 F.2d 1163, 1166–1167 (6th Cir. 1974). This is not so because of any ascription of bad faith to the witness; it is because "the witness [after misidentification due to an impermissibly suggestive photographic display] is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent . . . courtroom identification." *Simmons v. United States,* 390 U.S. 377, 383–384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

There was no testimony by Mr. Geiben which would indicate any physical characteristics that enabled him to identify Dailey as the criminal. *United States v. Gambrill, supra,* 449 F.2d at 1155. The only distinctive aspect of the defendant's physical appearance which was discussed at trial was his mustache. Eight days after the crime Mr. Geiben signed a statement to the effect that the criminal did not have a mustache, yet the photographs of Dailey taken on the day of his arrest, which was also the day of the crime, show that he had a prominent mustache. At trial the witness inexplicably changed his story and recalled that the gunman at the crime did have a mustache. The opportunity for Geiben to view the gunman at the crime was not substantial. The door to the bank opened inward and he was standing inside. Outside it was raining heavily, and he just caught a glimpse of the two men.[2] "[T]he dangers for the suspect

---

2. The guard's estimate of the time he viewed the men was "not over thirty seconds." Since the two gunmen appeared just before Mr. Lindewerth ran into the bank, this would

mean that the witness stood in the open door for nearly 30 seconds while one of the robbers pointed a gun at him before he slammed the door. This seems improbable, and therefore it

are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest." *United States v. Wade*, 388 U.S. 218, 229, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967).

We have mentioned Geiben's confusion concerning whether the suspect had a mustache. He also indicated the gunman wore a denim jacket, while the defendant had a leather jacket when arrested. The guard originally testified that he told the police simply that the man with the gun wore a black hat; on cross-examination he added that he had reported the hat had a feather; still later he claimed to have told the police that the hat also had a band, but he could not remember whether it was a white or a black band.

Mr. Geiben testified that he had reported that the gunman had worn a red and black shirt. He explained he did not see the green on Dailey's shirt because of the jacket he wore, although he stated that the jacket was open. However, we note that he also testified that the gunman's shirt had black sleeves.[3] We are unable to see how the guard could have viewed the shirt sleeves of the criminal while he had his jacket on. The conclusion is inescapable that the witness' description of the gunman's shirt was based not on what he remembered from the crime, *but was based instead on the photographs of Dailey, taken at the police station with his jacket removed, which he had seen two hours earlier in the prosecutor's office.*

■ The discrepancies between the defendant's appearance when arrested and the description given by Geiben to the police, and the inconsistencies in the witness' testimony on the stand tend to indicate that the courtroom identification was tainted by the invalid photographic display, and not based on the witness' independent observation at the scene of the crime. *Marshall v. Rose, supra,* 499 F.2d at 1167; *United States v. Sanders,* 156 U.S.App.D.C. 210, 479 F.2d 1193, 1197–1198 (1973).

■ The alleged identification by Geiben of the defendant as he was being arrested does not convince us that the courtroom identification was not tainted. As we have previously noted, Geiben stated eight days after the offense that "After the attempted robbery, and to this date, I have not identified [the gunman who participated in the robbery attempt] in person in a face-to-face confrontation . . . ." Yet at trial, over a month after the statement, he recalled such a confrontation, at which he claimed to have identified the accused as the gunman who had been at the crime. Even if the identification were as described at trial it would not provide a basis for the courtroom identification; there is no question that the person arrested was the person on trial. Only observations during the crime may serve as a basis for subsequent identification; the question is whether the person arrested and tried is the person who committed the crime. *United States v. Jackson,* 166 U.S.App.D.C. 166, 509 F.2d 499, 506 (1974). Nor do we regard the arrest identification as so reliable that any error in admitting the courtroom identification was harmless. Besides the question of whether the identification occurred at all in light of Mr. Geiben's February 5, 1975, statement, there are the questions of the discrepancies between his descriptions to the police and the defendant's appearance, and the inconsistencies in his trial testimony.

■ Finally, the circumstances surrounding the flagrantly suggestive and

---

is not unlikely that Geiben's concept of time was distorted by the excitement of the moment. The actual time he viewed the gunman might well have been considerably less than he estimated, especially in light of his other testimony that he just got a glimpse of the robbers.

3. Q All right, could you describe what kind of a shirt that the man with the gun had on?

A It was a shirt with red and black, black background *with black sleeves* and big red going across—[interrupted].

Transcript, 27 (emphasis added).

totally unnecessary photographic display suggest that these means were utilized because the prosecutor was concerned that the witness could not otherwise identify Dailey as the perpetrator of the crime. *See Allen v. Moore,* 453 F.2d 970, 974 (1st Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972). The government assumes the burden of· showing a basis for the courtroom identification independent of any improper photographic display. *United States v. Valez,* 467 F.2d 600, 602 (8th Cir. 1972). Geiben was the only eyewitness to the crime and his identification of the accused was uncorroborated by any other evidence. *Marshall v. Rose, supra,* 499 F.2d at 1168; *United States v. Johnson,* 461 F.2d 1165, 1169 (5th Cir. 1972).

II. *Prosecutor's Argument.*

 The defense presented was alibi. Dailey's fiancee testified that he had spent the night before the crime at her apartment in East St. Louis, Illinois, and left sometime after 7 a.m. the next day. Dailey's mother's testimony corroborated this. Mrs. Dailey also stated that the defendant was not yet home when she left for work that morning at about 6:45, but her son Stephen was home. He generally took an 8:30 bus to school. This was the only testimony concerning Stephen Dailey. The defendant testified that he took the bus from East St. Louis to return home on the morning of January 28, 1975, arriving home about 8:25. He left for work about 8:40 and went to a restaurant called Demello's for breakfast, then, according to his testimony, went to wait for the bus he customarily took to work. He stated that he was arrested while waiting at the bus stop, which is near the bank where the crime took place. Bus schedules were introduced to show the feasibility of the alibi. Dailey's employers testified concerning his good character.

On the second day of trial the defendant's younger brother Stephen was subpoenaed by the government, for the purpose of rebutting the alibi. Stephen Dailey was brought to the courthouse by United States Marshals and the Assistant United States Attorney interviewed him that morning before trial was to progress. At the conclusion of the interview government counsel decided that the defendant's brother should not testify in rebuttal, and told Stephen he could go home. He entered the courtroom as his brother's trial was in progress, and sat in the gallery.

During the final argument in rebuttal of the defense argument, the following transpired:

[Government counsel:] Now, where is the evidence between 8:00 and 9:10? Percy says he got home between 8:20, 8:25, the bus people said he gets off a bus up here at 8:18 where he walks to his home. *His brother Stephen had not left for school—*

[Defense counsel:] I object, his brother Stephen who's not been mentioned in this Court Room—[At this point government counsel turned dramatically to the back of the courtroom and pointed at the defendant's brother.]

[Government counsel:] *He has, and he sits here today.*

[Defense counsel:] I object to that.

The Court: Well, overruled. The mother as I recall testified about certain other members of the family. May I again, ladies and gentlemen, the arguments of counsel and objections are not evidence. You heard the testimony and you are the sole judges of that testimony and the reasonable inferences to be drawn therefrom. Proceed.

[Government counsel:] *He sits here in Court* and then we get to Demello's, the little coffee shop, and he's been going to work everyday, everyday, and he stops in there from time to time, get the coffee. Don't you think someone from Demello's would know whether he was there?

[Defense counsel:] I object to that, he's trying to place the burden on the defense, Your Honor.

The Court: Sustained, sustained. The defense has no burden to put on any testimony. Proceed, counsel.

[Government counsel:] They put on witnesses who know nothing about this case.

[Defense counsel:] I object to that.

The Court: Overruled.

[Government counsel:] No one from Demello's is here. *Stephen Dailey sits in the Court Room—*

[Defense Counsel:] Your Honor—

[Government counsel:]—*silent.*

Transcript, 201–202 (emphasis added).

Though the prosecutor had brought the younger Dailey to the courthouse and satisfied himself that Stephen Dailey would not rebut the defense alibi, he was permitted to infer in his argument that the defendant's own brother, sitting a few steps from the witness stand, would not testify favorably for him.[4] The government relies on the rule that when a witness is particularly within the control of the defendant but is not called by him, an inference arises that the witness' testimony would be unfavorable to the defendant. *See, e. g., Kampmeyer v. United States,* 227 F.2d 313, 323–324 (8th Cir. 1955), *cert. denied,* 351 U.S. 904, 76 S.Ct. 706, 100 L.Ed. 1441 (1956). That rule finds no application in this case; it was clearly unfair for the prosecutor to argue an inference that Stephen Dailey's testimony would be unfavorable when he knew it would not. *See United States v. Miller,* 460 F.2d 582, 588 (10th Cir. 1972); *Bradley v. United States,* 136 U.S.App. D.C. 339, 420 F.2d 181, 185–187 (1969); *Smith v. United States,* 119 U.S.App.D.C. 22, 336 F.2d 941, 942 (1964), *cert. denied,* 385 U.S. 1017, 87 S.Ct. 736, 17 L.Ed.2d 554 (1967). In this case, as in *United States v. Achtenberg,* 459 F.2d 91, 98–99

(8th Cir.), *cert. denied,* 409 U.S. 932, 93 S.Ct. 229, 34 L.Ed.2d 187 (1972), the prosecutor deliberately misled the jury in a close case, and the court did not rectify the error.[5]

### III. *Cumulative Effect of Errors.*

■ This is not a case in which evidence of guilt is overwhelming. The jury deliberated for nine hours before returning a verdict. The prosecutor's action, in presenting an impermissibly suggestive photograph to the witness shortly before he was to testify and making an improper argument to the jury, could easily have been the difference between acquittal and conviction. In determining the cumulative effect of these two errors, we cannot say that the defendant was given a fair trial. Accordingly, we reverse the conviction and remand for further proceedings not inconsistent with the views expressed in this opinion.

VAN OOSTERHOUT, Senior Circuit Judge (specially concurring).

I concur on the basis of Division I of the majority opinion, the courtroom identification. The issue is close.

I find it unnecessary to reach issues II and III. However, I think this case is clearly distinguishable from *United States v. Achtenberg,* 459 F.2d 91, 98–99 (8th Cir. 1972), which is cited in Division II of the majority opinion. Moreover, we have held that "[t]he government is free to comment upon the defense's failure to call any witness to refute or contradict the government's case . . ." *United States v. Thompson,* 490 F.2d 1218, 1221 (8th Cir. 1974). *See United States v. Hagar,* 505 F.2d 737, 740 (8th Cir. 1974).

I also find it doubtful whether issue II was properly raised in the trial court.

---

4. We do not imply that the trial judge knew at the time of argument that the government had brought Stephen Dailey to the vicinity of the courtroom or had spoken with him before trial. The record does not bear this out.

We note that the prosecutor persisted in his argument that someone from Demello's should have been called to corroborate the alibi after an objection to this argument had been sus-

tained. We find it unnecessary to consider the effect of this argument.

5. This is not the first time that the closing argument of this prosecutor has been questioned in this court. *United States v. Corbett,* 518 F.2d 113, 116 (8th Cir. 1975); *United States v. Kirk,* 496 F.2d 947, 951 (8th Cir. 1974).