**UNITED STATES of America, Appellee,**

v.

**Roy SPOTTED WAR BONNET, Appellant.**

No. 88–5040.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1989.

Decided Aug. 23, 1989.

Rehearing and Rehearing En Banc Denied Oct. 19, 1989.

Jerry L. Wattier, Pierre, S.D., for appellant.

David Zuercher, Pierre, S.D., for appellee.

Before LAY, Chief Judge, ARNOLD and WOLLMAN, Circuit Judges.

WOLLMAN, Circuit Judge.

Roy Spotted War Bonnet (defendant) appeals his convictions on two counts of carnal knowledge in violation of 18 U.S.C. §§ 1153, 2032 and two counts of incest in violation of 18 U.S.C. § 1153 and S.D. Codified Laws Ann. §§ 22–22–1(6), 25–1–6. We affirm.

### I.

Defendant was indicted for carnally knowing and accomplishing acts of sexual penetration with his daughters, Skylene Spotted War Bonnet, then age six, and Annie Spotted War Bonnet, then age four. Prior to trial, defendant moved the district court[1] to conduct an *in camera* examination of Skylene and Annie to determine if they were competent to testify and to appoint a psychiatrist to examine Skylene and Annie. The court denied both motions. The court granted defendant's motion that any person who had interviewed Skylene or

Annie be prevented from expressing an opinion regarding Skylene's and Annie's truthfulness.

After considering testimony from Skylene and Annie bearing on their competency to testify, the district court allowed them to testify about the sexual acts their father had committed against them.

Ms. Priscilla Hornby, who at the time in question was a supervisor of Child Protection Services for the South Dakota Department of Social Services, interviewed Skylene and Annie three days after their mother reported the alleged acts giving rise to the charges against defendant. Ms. Hornby had also interviewed Skylene the preceding month in connection with allegations that she had been sexually abused by her uncle. Over defendant's objections, Ms. Hornby was permitted to testify about the statements Skylene and Annie had made to her about the sexual acts allegedly performed on them by defendant.

Dr. Mary Curran, a clinical psychologist who had interviewed the girls at the request of the South Dakota Department of Social Services, also testified. She described her evaluation of and therapy with the girls. At one point, Dr. Curran testified to Skylene's conflicting statements about whether her father had sexually abused her:

> [Dr. Curran] I asked her how she got the courage to tell, to say that her dad did it when he really didn't, because she had said he didn't do it. I went with her current statement that Roy had not done anything to her. I said you know, that must have taken a lot of courage to say he did it and then to say he didn't do it. How did you get that courage.
>
> [United States Attorney] What was her response?
>
> [Dr. Curran] Her response was I didn't want to be sent to a foster home.
>
> \* \* \* \* \* \*
>
> [United States Attorney] On that occasion did you have any further conversa-

---

1. The Honorable Donald J. Porter, Chief Judge, United States District Court for the District of South Dakota.

tion with Skylene concerning the alleged abuse by her father?

[Dr. Curran] No. I think basically what I noted was that Skylene was pretty anxious and she was looking at [her mother] all the time. I sensed that what I had gotten was by not asking her a question that she could have been prepared for, like how did you get the courage to do that, that what she really gave me was an honest answer, that—

Record at 152–53. At this point, defense counsel objected and moved the court to strike the "honest answer" statement and to instruct the jury to disregard it. The district court denied the motion, holding that Dr. Curran's statement was nonresponsive and did not directly comment on Skylene's veracity with respect to her testimony that her father had committed sexual abuse against her.

## II.

■ Defendant contends that the district court should have appointed a psychiatrist pursuant to 18 U.S.C. § 3006A(e)(1) to examine Skylene and Annie. Section 3006A(e)(1) authorizes a court to appoint an expert for a defendant if the court finds that the expert's services are necessary and the defendant is financially unable to obtain them. To establish that an expert is necessary, however, a defendant must . show a reasonable probability that an expert would aid in the defendant's defense and that denial of expert assistance would result in an unfair trial. *United States v. St. John*, 851 F.2d 1096, 1098 (8th Cir. 1988); *Little v. Armontrout*, 835 F.2d 1240, 1244 (8th Cir.1987) (en banc), *cert. denied*, —— U.S. ——, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988).

■ We conclude that defendant failed to show a reasonable probability that a psychiatrist would aid in his defense. In his motion for appointment of an expert and throughout the motion hearing defendant claimed that he needed an expert to examine Skylene and Annie and then testify as to their credibility and competency. Appointment of an expert for those reasons, however, would have been inappropri-

ate. First, an expert witness may not give an opinion as to the believability or truthfulness of an alleged victim's story. *United States v. Azure*, 801 F.2d 336, 340–41 (8th Cir.1986). Second, there is no showing that an expert witness would have helped defendant show that the children were not competent to testify.

We also find that the district court's refusal to appoint a psychiatrist did not result in an unfair trial. Under section 3006A(e)(1), "the state need not provide the indigent with all the tools the wealthy may buy, [but] it must provide the defendant with the 'basic tools of an adequate defense.'" *Little*, 835 F.2d at 1243 (quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971)). Defendant was given the "basic tools of an adequate defense." The district court appointed a clinical psychologist to assist defendant. Although the appointment did not include the right to examine Skylene and Annie, the psychologist reviewed the records of interviews conducted by the Department of Social Services and Dr. Curran. The psychologist was present in the courtroom when Skylene and Annie testified, and defense counsel consulted with him during the trial.

## III.

Defendant next contends that the district court erred in denying his motion for an *in camera* determination of Skylene's and Annie's competency to testify. The district court did not determine the girls' competency before it allowed them to take the witness stand. Instead, the district court required the United States attorney to lay a foundation of competency before questioning Skylene and Annie regarding the sexual abuse.

■ A district court's decision regarding competency is not disturbed on appeal unless clearly erroneous. This is true not only with respect to the district court's decision regarding testimonial capacity but also with respect to the means by which the district court chooses to appraise capacity. *United States v. Schoefield*, 465 F.2d 560 at 562 (D.C.Cir.1972).

"The ultimate test of competence of a young child is whether he has the requisite intelligence and mental capacity to understand, recall and narrate his impressions of an occurrence." *Id.; see also McCormick on Evidence* § 62, at 156 (3d ed. 1984). The district court found that both Skylene and Annie had the requisite intelligence. Moreover, they were able to testify to their age, grade in school, teacher, favorite subject, home, family members, and the consequences of committing wrongful acts. True, Annie, who was age six at the time of trial, had difficulty responding to the prosecutor's questions on direct examination and failed to answer a number of questions. Nevertheless, the court found her competent to testify. In doing so, the district court followed a procedure that is in accord with conventional wisdom: "Though the tribunal is unskilled, and the [child's] testimony [is] difficult to weigh, it is still better to let the evidence come in for what it is worth, with cautionary instructions." *McCormick on Evidence* § 62, at 156 (3d ed. 1984); *see also,* Fed.R.Evid. 601 advisory committee's note (discretion regularly exercised in favor of allowing testimony).

It is appropriate for the court to conduct a preliminary voir dire to determine the competency of young children. *Schoefield,* 465 F.2d at 562. Our decisions, however, do not require the court to conduct such a determination. We find that the district court did not err in following the procedures that it chose to adopt.

### IV.

Defendant contends that the district court erred in not striking Dr. Curran's opinion regarding the honesty of Skylene's statement that she did not want to go to a foster home. He bases his contention on *United States v. Azure,* 801 F.2d 336 (8th Cir.1986), in which we held that an expert's opinion regarding the credibility of an alleged victim's testimony invaded the exclusive province of the jury to determine the credibility of witnesses. *Id.* at 340–41. We conclude, however, that *Azure* is distinguishable from this case.

In *Azure,* we found that Dr. ten Bensel, a pediatrician and an expert on child abuse, put "his stamp of believability on [the alleged victim's] entire story." *Id.* at 340. Although defense counsel objected to his testimony prior to trial, the trial court allowed Dr. ten Bensel to testify that the alleged victim was believable and that he could "see no reason why she would not be telling the truth in this matter." *Id.* at 399. Essentially, Dr. ten Bensel told the jury that the alleged victim was truthful in saying that Azure was the person who had sexually abused her. *Id.* at 341.

In contrast, Dr. Curran did not usurp the jury's role at defendant's trial. She did not "put a stamp of believability" on Skylene's entire testimony. She did not tell the jury that Skylene was truthful in saying that her father was the person who had sexually abused her. Rather, she testified that in response to a question for which Skylene was unprepared, Skylene gave "an honest answer": that she did not want to be sent to a foster home. Indeed, at the point that she testified to Skylene's honesty regarding her fear of being sent to a foster home, Dr. Curran had not yet testified regarding Skylene's statements about her father's sexual acts toward her. We therefore conclude that Dr. Curran's challenged testimony did not interfere with the jury's role in determining the credibility of Skylene's testimony regarding defendant's conduct.

### V.

Defendant argues that because the five requirements of the residual hearsay rule, Fed.R.Evid. 803(24), were not satisfied, the trial court erred in permitting Dr. Curran and Ms. Hornby to testify regarding the statements made to them by the young girls about the sexual acts committed upon them by defendant.

We do not agree. Our review of the trial court's decision to admit testimony under Rule 803(24) is governed by an abuse of discretion standard. We have recognized that the special circumstances inherent in child sexual abuse—the unwillingness or inability of the young victims of the sexual abuse to testify fully about the details of

the events giving rise to the charges—make it necessary at times to admit testimony from social workers and other health professionals regarding the statements made to them by the victims in the setting of a doctor or social worker's office. *See, e.g., St. John,* 851 F.2d at 1098–99; *United States v. Shaw,* 824 F.2d 601, 609 (8th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988). Those cases, together with the cases cited therein, provide ample authority for our holding that the district court did not abuse its discretion in admitting the testimony of Dr. Curran and Ms. Hornby.[2]

We have considered the other contentions raised by defendant, including the argument that the evidence is insufficient to support the conviction, and conclude that they are without merit.

The judgment of conviction is affirmed.

LAY, Chief Judge, dissenting.

I respectfully dissent.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the United States Supreme Court observed that where the totality of the circumstances indicates that "the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification" there exists a denial of due process. *Id.* at 384, 88 S.Ct. at 971. *See also Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Once it is demonstrated that an unnecessarily suggestive confrontation has been used, testimony about that confrontation "must be excluded and the government then assumes the burden of proof by clear and convincing evidence that the witness' in-court identification was not tainted by the suggestive confrontation." *Sanchell v. Parratt,* 530 F.2d 286, 293 (8th Cir.1976). A thorough reading of the transcript in the present case demonstrates a gross miscarriage of justice. A serious deprivation of the accused's right to due process has occurred in this case. The defendant has been sentenced to prison for fifteen years on the most unreliable, suggestive, and manipulated evidence contained in any record that I have ever reviewed.

At the outset, I wish to acknowledge that minor children are in grave need of protection against sexual abuse. At the same time, this case makes manifest that in child sexual abuse cases we need to bring to a complete halt cursory appellate review, performed under the guise of deference to "the trial court's discretion," of the admissibility of hearsay and suggestive testimony. Innocent citizens must not be deprived of their liberty without a fair trial, competent evidence, and due process of law simply because they have been accused of child abuse. Our zeal to protect young children from sexual abuse should not allow courts to ignore or to diminish the constitutional rights of any person, even those who stand accused of heinous crimes.

The factual scenario of the Government's case in this instance is based on totally incompetent and unreliable evidence. Not only has the guilt of the defendant been determined with evidence severely tainted by suggestion and manipulation, but this indigent defendant has also been deprived of his constitutional right to the appointment of an expert witness so as to effectively rebut the highly prejudicial testimony of the victims and of the Government experts.

On June 2, 1986, Patricia White Buffalo Chief took her daughter Skylene, age six, to the Indian Health Management Clinic in St. Francis, South Dakota, for treatment of a rash on her arm. On June 18, Patricia was informed that a routine lab test which had been run on Skylene indicated that she had been exposed to a sexually-transmitted disease. Social worker Priscilla Hornby interviewed Skylene the next day to evaluate the possibility of sexual abuse. Skylene allegedly told Hornby that her uncle, Ernie Solomon White Buffalo Chief, had awakened her one night, carried her downstairs, taken off her panties, and placed his

---

**2.** Likewise, we conclude that the trial court did not abuse its discretion in admitting Dr. Curran's testimony under Rule 803(4).

fingers inside of her "private part." Ernie was apparently living in the Spotted War Bonnet home at this time.

Skylene and her sister Annie, age four, were subsequently subjected to a medical exam. The physician who conducted the exam found *no medical evidence* to support the allegation that these children were ever sexually abused. Furthermore, the physician found that the test given to Skylene to determine whether she had a sexually-transmitted disease was unreliable when used with prepubital children and may have falsely shown a positive result. Roy Spotted War Bonnet, the father of the children and the defendant in this case, voluntarily submitted himself to a medical examination several months later and was found not to have the sexually-transmitted disease that Skylene had earlier been suspected of having.

Hornby states that on July 16, 1986, she was telephoned by Patricia and told that both Skylene and Annie had been abused by their father. During this period of time, Patricia and Roy had experienced domestic problems and the couple had separated. Another interview followed. Skylene reported to Hornby that her Uncle Ernie previously had not only used his fingers but also "got on top of her and * * * the man part got hard and * * * had white stuff that came out." According to Hornby, Skylene stated in this same interview that her father had abused her in a similar manner. Hornby further stated that in an interview that same day, Annie told her that she too had been sexually abused by her father.

On January 30, 1987, Hornby told Patricia that she believed Roy had sexually abused the children. Patricia was then living in a shelter house away from the defendant. Hornby stated that she would file for custody of the children and place them in a foster home if Patricia went back to Roy. Hornby admitted she had told Patricia this on many occasions. Transcript at 134–35. This testimony must be weighed with an interview on January 29, 1987, which revealed that the children had been previously threatened by their Uncle Ernie and induced to accuse their father.

On January 29, 1987, Dr. Mary Carole Curran, a psychologist from Yankton, South Dakota (who was paid by the FBI) became involved in the case. On this date, Skylene was interviewed by Dr. Curran where, with the aid of anatomically correct dolls, she described how she had been awakened by Ernie, carried downstairs, and sexually abused. Skylene flatly denied that her father had abused her and stated that instead Ernie had told her to tell others that her father had abused her. Transcript at 150. Patricia admits that she had a telephone conversation with her brother Ernie in which he admitted that he had abused Skylene, threatened the child, and told her to tell others that it was Roy who had perpetrated the abuse. Transcript at 357.

Hornby was subpoenaed and on February 4, 1987, testified against Ernie White Buffalo Chief regarding charges of child sexual abuse occurring in the Spotted War Bonnet home. On that date, Dr. Curran and Hornby interviewed Annie and Skylene in the grand jury room at the federal courthouse in Pierre. Skylene again denied that her father had abused her, and maintained that Ernie had threatened her and told her to accuse her father instead of him. Transcript at 131, 151–52. Dr. Curran then interviewed Annie individually using anatomically correct dolls. During that session Annie allegedly told Dr. Curran that their father had abused them. Transcript at 182–86.

Curran interviewed the children on several subsequent occasions. In each of these sessions, the children were given anatomically correct dolls and told that they could not play with the other toys in Curran's office until they demonstrated to her what their father had done to them. During the time these interviews took place, Skylene and Annie were either living in a shelter with their mother or in foster homes apart from their mother.

The record clearly demonstrates that Skylene's and Annie's identification of their father as their abuser is greatly tainted by

the suggestive and manipulative methods employed by Hornby and Curran. From the time Patricia initially informed Hornby that Roy had sexually abused these children, every interview that either Hornby or Curran conducted with Skylene and Annie was aimed exclusively at validating the charges against Roy.[1] In this sense, this case is analogous to the scores of cases in which law enforcement personnel have been found as a matter of law to have used improper suggestive and manipulative techniques in order to attain sought-after identification. *See, e.g., Harris v. Wyrick,* 644 F.2d 710 (8th Cir.1981); *United States v. Baykowski,* 583 F.2d 1046 (8th Cir.1978); *Sanchell v. Parratt,* 530 F.2d 286 (8th Cir. 1976); *United States v. Dailey,* 524 F.2d 911 (8th Cir.1975). I would hold the suggestive and manipulative measures used by Hornby and Curran have resulted in a denial of due process in this case.

Curran and Hornby employed highly coercive methods to obtain from the children the identification of their father as their abuser.[2] The testimony of Dr. Curran is quite revealing in this regard. It is clear that both children felt threatened with the prospect of placement in a foster home if they failed to accuse their father of sexual abuse. Social worker Hornby had expressly threatened Patricia that if she returned to Roy that Hornby would take the children away from her and place them in a foster home. Curran had told the children they must tell the truth, which she believed meant accusing their father, if they wanted to avoid placement in a foster home. Later on, when the "foster home" threat had become an actuality, the children accused their father. Consider Dr. Curran's testimony about her sessions with the children:

> I guess I began talking about school and about *foster care.* The children had been removed at that point *and were placed in a foster home and the children were very unhappy in foster care,* and so we spent some time kind of reviewing the relationship that Skylene and I had developed and we talked a little bit about school and about what *foster care* was like *and about wanting to go back home* and those kinds of things, very feeling things.
>
> \*    \*    \*    \*    \*    \*
>
> Skylene was very sad. *She missed her mother and did want to be back home* and *she was confused, talked about feeling confused.*
>
> \*    \*    \*    \*    \*    \*
>
> I basically, it surfaced because *we were talking about her wanting to go home and I said do you know what has to happen in order for you to go home and she says I have to tell the truth.*
>
> \*    \*    \*    \*    \*    \*
>
> Very often if the child has met a time or two with the social worker I sometimes include the social worker because the child trusts the social worker, trust[s] the mother and it gives me some support and *I can tie into the fact that you trust somebody else and they trust me* and *I can capitalize on their trust* and it makes the therapy go better.
>
> \*    \*    \*    \*    \*    \*
>
> Q. [to Dr. Curran] *Did you answer a question do you know [what's] necessary to go home or something to that effect?*
> A. *Something to that effect, yes.*
>
> \*    \*    \*    \*    \*    \*
>
> I most ways not because Skylene has always been kind of excited *even when we talked about things that she didn't like to talk about.* She always was pretty willing to come into my office. Annie only *later started to vie with her and argue to go first.* She always kind of let Skylene go first.

1. Regarding the March interview Dr. Curran stated:
   > A. I really didn't spend much time reviewing the [a]buse by Ernie. That thing was tried and it's past so I didn't really spend a lot—
   > Q. I'm sorry, I didn't hear your last comment.
   >
   > A. I said I didn't spend a lot of time reviewing the reports on Ernie's abuse.
   >
   > Transcript at 199–200.

2. There is no contention that either Hornby's or Curran's actions were undertaken dishonestly or in bad faith.

Transcript at 169, 170, 199–211 (emphasis added).

There can be little doubt that the children's statements to Curran and Hornby were given under circumstances that intensified the likelihood of manipulation and suggestion, and through the use of methods that amounted to total psychological coercion. The record demonstrates that the children had been exposed to a great deal of turmoil in the Spotted War Bonnet household. Ernie had been accused of abusing Skylene. Hornby actively conducted an investigation into the matter for many months. The relationship between Roy and Patricia had become strained and they had separated. The children, who very much wanted to remain with their mother, were subsequently presented with the prospect of being placed in foster homes. In the midst of all of this, Hornby and Curran offered Skylene and Annie a way in which they could remain with their mother: accuse their father that he had sexually abused them.

In *Parker v. Sigler*, 413 F.2d 459 (8th Cir.1969), *vacated on other grounds*, 396 U.S. 482, 90 S.Ct. 667, 24 L.Ed.2d 672 (1970), this court set aside the confession of a college educated adult due to interrogation techniques that amounted to improper psychological coercion. In writing for the court, Chief Judge Van Oosterhout observed:

> Mr. Reid, who conducted the interrogation, is an experienced criminal investigator obtained from Chicago and is coauthor of works on criminal interrogation and confessions. His publications and tactics are discussed in considerable detail by Chief Justice Warren in *Miranda* [*v. Arizona* ], at pp. 449 to 458 of 384 U.S. [436], at pp. 1614 to 1619 of 86 S.Ct. [1602, at p. 694 of 16 L.Ed.2d]. The use of some of the tactics advocated in the book are admitted by Reid. *The interrogation took place in a small room without windows with only Reid and the defendant present. Reid had defendant sit at a table facing him with their knees touching each other. Reid admitted patting the defendant on the shoulder and stroking defendant's hair a number of times. He insisted defendant constantly look him in the eye and lifted up the defendant's chin from time to time to accomplish this objective.* Defendant was subjected to a lie detector test and was told that the machine revealed he was lying. Defendant was *accused a number of times* of murdering his wife. *Such activity clearly appears to go beyond approved standards.*

> \*    \*    \*    \*    \*    \*

> The only factor of substance which might have a tendency to support voluntariness mentioned by the Nebraska courts is the fact that *Parker held a college degree in forestry, that he was intelligent and held a responsible position.* He had no previous criminal experience and there is no reason to believe that he was aware of or that he voluntarily waived his constitutional rights. While *intelligence is a factor to consider in the coercion issue,* there can be no doubt that people of intelligence are susceptible to mental coercion.

> \*    \*    \*    \*    \*    \*

> We hold as a *matter of law* that *when the totality of the circumstances are considered* and when the facts in this case are compared with those in the cases hereinabove discussed, a determination is required that the confessions received in evidence were *coerced and involuntary,* and that the *defendant's constitutional rights were violated by the reception of the confessions in evidence and the submission thereof to the jury.*

*Parker,* 413 F.2d at 465–66 (emphasis added).

In the instant case, similar coercive techniques were used by Dr. Curran in order to secure identification by the children of their father as their abuser. She hugged them, joked with them, promised to allow them to play with the toys in her office, gave them candy, and generally provided them with a warm environment. In exchange for these things, the children were expected to identify their father as their

sexual abuser. Again returning to Dr. Curran's testimony:

> At one point I asked her how she got the courage to tell, to say that her dad did it when he really didn't, because she had said he didn't do it. I went with her current statement that Roy had not done anything to her. I said you know, that must have taken a lot of courage to say he did it and then to say he didn't do it. How did you get that courage.
>
> \* \* \* \* \* \*
>
> I said Skylene, *what would make you feel like you would be put in a foster home.* \* \* \* *I was going to pursue that* \* \* \*.
>
> \* \* \* \* \* \*
>
> *I sensed that what I had gotten was by not asking her a question that she could have been prepared for*, like how did you get the courage to do that, that what she really gave me was an honest answer, that—[3]
>
> \* \* \* \* \* \*
>
> I move with easy feelings and then move into the more scary feelings, sad and scared and angry and lonely and so forth.
>
> If they say yes they've had a feeling and share it with me I say oh, good, you know, because you know what I would think if you didn't [have] a feeling and they say no. I'd say well, I'd think you were dead, I'd really be scared to be in this room with somebody who was dead, so I'm really glad you've got a feeling.
>
> We kind of build a rapport right off in terms of they're glad they're alive and so am I and they kind of have, *move into a fantasy of what it would be like to be in a room with a dead person that didn't have any feelings.*
>
> \* \* \* \* \* \*

> Make the child feel comfortable, let them know that I'm okay. \* \* \* We just kind of talk and become friends and it's kind of nice to have a friend.
>
> \* \* \* \* \* \*
>
> Basically I again presented to Skylene the fact that at *one time she had said Roy Spotted War Bonnet had abused her and at another time she denied it and I basically said, you know, it's okay.* All I want to know is what happened. You don't have to be afraid. We will support you. \* \* \* We don't want the thing like what happened with Annie to happen to you anymore and so if it didn't happen that's okay. *Then we want you to go home and be at home.* If it did happen then we need to know so that you can be safe and we can protect you.
>
> We talked about fear and how scarey it is and she admitted that she was very afraid of Roy. *She said he had been very mean to her mother.* She also said that her mother is afraid of him and that she wasn't really very sure whether her mother could keep her safe. *She was aware that her mother had gone to the shelter again even though she was in foster care.* She indicated that she knew that mother had left Roy and was living in the shelter and said that *she would rather live with just mother and the other children than with Roy and the family.*
> *Basically I tried to just make the environment safe in caring and that whatever she wanted to tell me was okay.*
>
> \* \* \* \* \* \*
>
> She had a difficult time talking because she was crying and so I did ask a lot of yes, no questions. I said I'm going to ask you the whole question and then I'll go back and pick up pieces or multiple choice and then I'll come back so that

---

**3.** Defendant argues as well that this testimony violates *United States v. Azure,* 801 F.2d 336 (8th Cir.1986), which holds that an expert may not testify as to the credibility of the child. *Id.* at 340–41. The majority urges that Dr. Curran was commenting on her statement about the "foster home" as an honest answer and not about her accusation of her father. In all due respect, this is a play on words. The context of the remarks is interrelated and Curran's view that the answer was an "honest one" is interconnected to the entire statement. There is no question that the use of Dr. Curran's entire testimony was an attempt by the Government to show that the children's accusation of sexual assault by Roy Spotted War Bonnet was in fact truthful.

you know what I'm going to ask and you can tell me.

\*    \*    \*    \*    \*    \*

*We spent a lot of time after that in the playroom* and the other thing that I usually do then is to end the session by seeing if she remembers what that secret word I gave her to remember at the beginning was. That gives me a test for whether she has at least long-term memory of an hour and children very often are quite proud of things when they can remember and I said, you know, I probably shouldn't put you on the spot, but do you remember what that was that I asked you to remember and she said "apple" and just *kind of beams and kind of breaks the tension and tightness of talking about really scarey things* and after that I met with Annie.

\*    \*    \*    \*    \*    \*

I said, you know, you don't really like to talk about this but I need to be clear about it and, you know, I guess I'm just getting old and I can't remember things and I know that old ladies are a real pain, *but can you just tell me one more time and then we'll go to the playroom.* Transcript at 147–48, 171–73, 176–77.

In reviewing these excerpts, it is important to remember that Dr. Curran was interviewing impressionable children of very tender years about events which occurred when they were only four and six years old. Yet the methods and scare tactics (Curran's direction to imagine being in a room with a dead person!) that were employed in these interviews are remarkably similar to many of those found improperly coercive in *Parker* where the person interviewed was a college-educated adult, intelligent, and the holder of a responsible position in society. *See Parker*, 413 F.2d at 466.

The manipulative and suggestive methods employed by both Curran and Hornby are particularly evident in their use of the anatomically correct dolls. When the chil-

**4.** The record reflects that Dr. Curran interviewed the children on January 29, February 4,

dren's rehearsed courtroom testimony is evaluated in light of this manipulation, it borders on the incredible to say that Dr. Curran's testimony about the dolls was proper. Dr. Curran (who was paid by the FBI for all her services) used the dolls with the children on at least five occasions:[4]
\* \* \* *I said you know, would you rather show us with mom and Priscilla there or, you know, just you and Annie said just you.*

So we slipped into the little witness room where the children had been all week. *We discussed a little bit about scarey feelings and that, you know, it's scarey to talk about things that have happened and would she like to select the doll.* \* \* \* *Then I said what other doll do you need.*

\*    \*    \*    \*    \*    \*

*She got really frightened looking, quiet, kind of withdrawn.* But she looked— *her eyes went immediately, when asked that, went immediately to the groin area of the male doll.* She didn't say anything, *she just looked at it.*

\*    \*    \*    \*    \*    \*

I said Annie, could you tell mom who was doing that. It was obvious, she had the doll with the penis in the vagina. *She said Ernie, I said Annie, that isn't what you just said, you know, are you scared to tell mom.* \* \* \* *I said Annie, you didn't tell me that Ernie did it. You told me dad did it. Didn't you want to tell mom.* It's important that you're afraid to tell mom. She just real agonized said I don't want my daddy to go to jail. \* \* \* *Patty then left the room and I just kind of hugged Annie and I said, you know, it's really hard to talk about what happened and I'm really proud of you to be able to tell me what happened when you're so afraid.*

\*    \*    \*    \*    \*    \*

We put the dolls away and I gave her a piece of candy, I think, and said, you know, its going to be okay.

March 2, April 10, and September 15, 1987.

Transcript at 183–86 (Dr. Curran's account of the February 24, 1987 interview).

Again, I always begin the same way trying to build some rapport and talking about what was happening and *about being in foster care* and those kinds of things. Then I asked her if she could show me again what we remembered, did she remember when we talked and when she showed me. *So I again had her select the dolls.* She selected an Annie doll and an adult male doll and when I asked her who the boy doll is, I said is it Ernie and she nodded no. *I said is it dad and she nodded yes.* I asked her is dad's name Roy and she nodded yes.

\* \* \* \* \* \*

Basically she showed me exactly the same thing she had shown me before, the lowering of the female doll's pants, the lowering of the male doll pants and the inserting of the penis into the vagina.

Transcript at 187–88 (Dr. Curran's account of the March 2, 1987 interview).

Again she selected the dolls. She selected a male doll to represent Roy and a female doll to represent herself and *I had her select the dolls* and tell me who was who so that it wasn't—I didn't say pick a Roy doll. *I said pick a doll,* whatever doll you need and who is that. She said dad.

She also selected two more female dolls, one for Skylene and one for mom. She placed the Annie doll in a bed and we created the bedroom in my office, you know, we blocked of a little place and this is our room, she said. She elaborated, she was talking about the room where she and Skylene slept. She indicated on the night that this happened mom and Skylene were in bed together in another room so she placed mom in Skylene's bed in a different room.

\* \* \* \* \* \*

He took his pants down and I asked her to show me and she lowered them to knee level. The pants on that doll are very difficult to get off so I said were they clear off or like that and she said like that, they weren't clear off.

Then she removed both the tops and bottoms of the pajamas on the doll. She demonstrated with the doll that Roy inserted the penis in her vagina and rubbed the vaginal area with his hands. She took the doll's hand and manually demonstrated the motions. I asked her what it felt like and she said it hurt. I asked her if she cried and she said she cried. I said what did he say and she said he said stop crying.

I asked her did the penis look like this was the index finger straight up or like this with it down and she showed me it was up. She stated that he then dressed himself and dressed her and that he told her if she told anyone he would beat her mother up.

That really was the most verbal that Annie had ever been with me. She was feeling a little more comfortable. I asked her if she had told her mother about it and she nodded that she had. *Then we talked a little bit about mom going to the shelter and how she felt. She said she felt better when mom was at the shelter. We went to the playroom then.*

Transcript at 190–92 (Dr. Curran's account of the September 15, 1987 interview).

The empirical literature clearly reflects a concern that repeated use of the dolls can be highly suggestive. *See, e.g.,* Comment, *The Admissibility of Expert Psychological Testimony in Cases Involving the Sexual Misuse of a Child,* 42 U.Miami L.Rev. 1033, 1057 (1988) (emphasizes critical importance of testing reliability of this evidence); Feher, *The Alleged Molestation Victim, The Rules of Evidence, and the Constitution: Should Children Really Be Seen and Not Heard?,* 14 Am.J.Crim.L. 227, 237–38 (1988) [hereinafter Feher] (child witnesses, already susceptible to suggestion due to their youth, who are subjected to highly coercive interviewing techniques involving anatomically correct dolls may experience permanent memory alteration); Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews,* 62 Wash.L.Rev. 705, 711 (1987) ("The danger in the use of the dolls is that they will stimulate fantasy and not

recall, and plant a falsified memory of fantasy to be recalled later as truth."). *See also United States v. Dorian*, 803 F.2d 1439, 1450 (8th Cir.1986) (Bright, J., dissenting) (use of anatomically correct dolls "adduces a relatively high degree of suggestiveness").[5] The problem of suggestion is particularly acute where the child is from a troubled domestic background, *see* Feher, *supra*, at 237 n. 69, and where an authority figure such as a social worker or a psychologist is prompting the children for certain responses, *see id.* at 237 n. 67.[6] Both of these factors were involved in this case. Furthermore, Skylene had allegedly already suffered abuse at the hands of her Uncle Ernie. There exists no clear or convincing evidence to show *for certain* whether Skylene's activities with the dolls related to Ernie or to her father. Similarly, Annie's interaction with the dolls may have been related to something Skylene told her about Ernie as opposed to the abuse she allegedly experienced at the hands of her father. Therefore, the value of evidence relating to the use of the dolls is inconclusive, as well as tainted by suggestion and manipulation.

Once the existence of suggestion or coercion has been established, the reliability of the identification must be tested under the "totality of the circumstances." The factors that must be considered in evaluating the likelihood of misidentification in-

---

5. One commentator has flatly stated that:

   testimony about anatomically correct dolls should be inadmissible. * * * In the first place, there is literally no theoretical nor any empirical basis for drawing any conclusion about what a given child's play with dolls means. In addition, there is at least a possibility that some children, evaluated by professionals who want them to acknowledge sexual abuse, may come to use the dolls in a fashion which leads fact finders (ignorant of our ignorance about the dolls) to believe unjustifiably that the children have been abused. Mental health professionals who testify have made and, if the testimony is admissible are likely to continue to make, extravagant and completely baseless claims about the significance of children's play with the dolls; and because the dolls purport to be a scientific demonstration which establishes an "aura of infallibility," the implicit message of doll-play testimony is likely to be much more influential with fact finders than any otherwise uncorroborated clinical conclusion by an expert that the child has been abused. * * * Finally, since dolls testimony is less likely to be used in criminal proceedings because prosecutors usually demand physical or other corroboration, dolls testimony is most likely to be crucial in just the kinds of proceedings—dependency and custody cases where the evidence is otherwise sketchy—and before just the kinds of judges where the risks of prejudicial overemphasis are the greatest. In short, balancing the probative value of doll testimony against its likely prejudicial impact leads to the conclusion that it should not be admissible.

   Levy, *Using "Scientific" Testimony to Prove Child Sexual Abuse* [to be published in 23 Fam.L.Q. 148 (1989)] (footnotes omitted).

6. The subjectivity involved in interpreting children's play with anatomically correct dolls has led to abuses:

   There are reports of the misuse of "anatomically correct" dolls; of the *failure to complete interviews and pursue investigation* once an "admission" has been made; of *interviewer threats not to allow children to go home before admitting abuse*; of *narrowly focused interviews* that ignore what the child is trying to say and emphasize anything remotely related to sex; of *rewards for "admissions"*; of *anger when the child will not "admit" abuse*; and of the *frequent use of leading questions*.

   Interviewers often ignore statements made by the child that do not conform to their own theory about the abuse. They may blatantly ignore improbable and incredible portions of some children's assertions which might otherwise indicate a lack of validity in the claim. Repeated interviews often occur. The child views these phenomena as a demand for more, or different, information, feeling that the interviewer was not satisfied by what the child already said. *If false allegations are repeated often enough, the child may well come to believe them.*

   The most significant problem may be that the interviewer is unaware that a false memory is being created in the child. *The interviewer is most likely trying to get the child to admit what the interviewer thinks is "the truth" in order to protect the child's best interest.* These procedures, whether intentional or not, bear significantly upon the child's testimony at trial. *Child witnesses, who are already susceptible to suggestion, then undergo highly coercive interviewing techniques and then relate the results of these interviews as evidence* at trial. It is not, then, a great leap to assume that some children are undergoing [a] type of *permanent memory alteration* * * *.

   Feher, *supra*, at 237–38 (footnotes omitted and emphasis added).

clude "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). First, in reviewing these factors, it is worth noting that the children at times demonstrated some difficulty in distinguishing between their father and their uncle for identification purposes. Transcript at 108. Second, the children initially denied that their father had abused them. They then fluctuated between indicating that their father did abuse them and that he did not abuse them. They gave at least three very different explanations when confronted with this inconsistency: Ernie threatened Skylene and told her to blame Roy; Roy threatened to beat their mother if Skylene or Annie told anyone; and Curran and Hornby conveyed to the children that they would be placed in a foster home if they did not tell them the truth. Third, during the interviews with Curran, the children had to undergo extensive prompting before they would demonstrate the abusive acts that Roy is alleged to have performed on them. They played with the dolls but did so only upon Dr. Curran's insistence and the promise that they would then be allowed to play with other toys in the office. It is very clear from the record that the children have no independent recollection of the events at issue in this case. The likelihood of misidentification, considering the children's youth, the traumatic experiences they have endured, and the highly suggestive and coercive methods used by Curran and Hornby, is so apparent that admission of this evidence constituted a denial of due process.

Another grave concern in this case, and one which is interrelated to the suggestive and coercive interviewing techniques discussed above, relates to the competency of these very young children to testify in court. In laying a foundation for Annie's testimony at trial, the prosecutor asked her a number of simple and basic questions. Annie failed to respond to many of the inquiries and had difficulty remembering certain events. For example:

Q. Last night when you talked to me did we tell you to say anything here today?

A. Yeah.

Q. What did we tell you to say?

A. [No response.]

Q. Can you remember?

A. No.

Q. You don't remember anything about last night?

A. No.

Q. Do you know what it is to tell a lie?

A. No.

* * * *

Q. Do you ever make up stories?

A. [No response.]

Q. Can you answer that one?

A. [No response.]

Q. Can you answer me, Annie?

A. No.

Q. Can you answer me?

A. Yes.

Q. Do you ever make up stories?

A. No.

Q. Are you going to make one up today?

A. No.

Q. Do you promise not to make up any stories today?

A. No.

Transcript at 45–46.

The trial court, expressing a concern that a sufficient foundation had not yet been laid, called a recess and discussed the issue with counsel outside the hearing of the jury. At the conclusion of this discussion, the trial court denied defendant's motion for an *in camera* examination of the child. Without ever expressly ruling on Annie's competency to testify, the court then decided that she would be permitted to testify and that the jury would be permitted to evaluate her credibility. It would appear that the court substituted and used interchangeably the concepts of competency and credibility. In explaining this ruling, the

court found Annie to be intelligent because it "was impressed with the fact that she spoke up. Her voice came over the microphone in a very direct way, giving the appearance of being alert." Transcript at 63–64.

While it is by no means mandatory that the trial court conduct a voir dire of a child witness in every case, such a measure was essential to ensure fairness in this case. These children were very young and demonstrated significant difficulty in remembering the events about which they were called to testify. In my judgment it was incumbent upon the trial court to conduct a voir dire in order to determine the children's competency under the circumstances existing in this case. *See United States v. Schoefield,* 465 F.2d 560, 562 (D.C.Cir.), *cert. denied,* 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972).[7] *Cf. United States v. Gutman,* 725 F.2d 417, 420 (7th Cir.) (court has the duty to conduct voir dire when witness' insanity has rendered questionable his competence to testify), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 183 (1984).

When Annie's testimony was interrupted, the court asserted that there had been insufficient foundation up to that point. However, Annie was subsequently permitted to continue her testimony without laying any further foundation. The court's only explanation for allowing Annie to testify further was that "she spoke up" and "her voice came over the microphone in a very direct way." I find this explanation puzzling. Annie had not even responded to many of the questions put to her by the prosecutor. More importantly, such a rationale is a questionable basis upon which to make a determination of competency. Without a doubt, the trial court may and should utilize its observations regarding a witness' demeanor to determine issues of competency. However, it is difficult to understand how the witness' voice can be used as the controlling factor in competency determinations.

Annie demonstrated significant problems with short term memory. It was imperative that the trial court develop this issue to determine whether Annie was competent to testify in this case. Judge Weinstein has observed in his treatise on evidence that it is not enough for a child to demonstrate an understanding of the oath to testify truthfully. A child is not competent to testify unless he or she is also capable of accurate recollection of the events about which he or she is called upon to testify. 3 J. Weinstein & M. Berger, *Weinstein's Evidence* 601–32 to –35 (1988). Instead, the court treated this issue as a matter relating only to credibility and left it to be decided by the jury. The record on its face demonstrates that Annie was not competent to testify. It was evident from her failure to answer many of the questions that she was very frightened. More significantly, she was unable to recall past events as demonstrated by her great difficulty remembering what had occurred the night before. Consequently, it is difficult to understand how she could accurately recall something that occurred several years before at a time when she was less than four years old. There is absolutely nothing in the record, brought out by either counsel or by the court, which in any way rehabilitates Annie's very apparent problems with memory and recall.

Indeed, Skylene (as well as Annie) had difficulty with recall of events and facts. For example, Skylene was very confused about her birth date. Transcript at 15, 30. However, far and away the most disturbing aspect of either child's testimony was that neither one demonstrated an independent recollection of the alleged sexual abuse by their father. Skylene and Annie could only recall the content of her discussions with Dr. Curran. Skylene gave the following answers at trial:

---

7. In *Schoefield,* the D.C. Circuit determined that a competency hearing was not necessary to determine the competency of a twelve year old boy to testify. However, the court observed "[o]f course, with children of tender years, a trial judge properly conducts a preliminary voir dire, and we have indicated our concern that such questioning be handled in a way that is meaningful, and not by inquiry that borders on the casual and uses leading questions." *Schoefield,* 465 F.2d at 562 (footnote omitted and emphasis added).

Q. \* \* \* Are you remembering what you told Dr. Curran, is that what you're telling us about today?

A. Yes.

Q. So you are not remembering what dad did, you're remembering what you told Dr. Curran?

A. Yes.

Q. You can't remember what dad did, you can only remember what you told Dr. Curran?

A. Yes.

Transcript at 38. Annie also demonstrated an absence of independent recollection of the events at issue in this case:

Q. How long ago did you talk to Dr. Curran?

A. [No response.]

Q. A long time ago?

A. Yes.

\* \* \* \* \* \*

Q. Are you trying to remember what you said to Dr. Curran?

A. Yes.

Q. Is it hard to remember everything you said to Dr. Curran?

A. Yes.

Q. Can you remember things that happened a long time ago or are you trying to remember things you said to Dr. Curran?

A. [No response.]

Q. Are you trying to remember what you said to Dr. Curran?

A. Yes.

Transcript at 77. Neither child could remember the actual events themselves. This is very troubling considering the fact that the children's testimony is the only "direct" evidence offered against the defendant in this case. Cf. *United States v. Dorian*, 803 F.2d 1439, 1443 (8th Cir.1986) (court determined that child's youth and obvious fright rendered her unable to testify meaningfully).

The questioning of the children's competency to testify at trial raises related concerns about the level of trustworthiness and reliability of hearsay statements attributed to Skylene and Annie which were admitted into evidence through Hornby's and Curran's testimony. While there is authority to support admission of these statements under hearsay exceptions contained in Federal Rules of Evidence 803(24) and 803(4), respectively, these exceptions were not intended to be blindly applied in every case. In each case the trustworthiness of the statements must be evaluated. In this case, the trustworthiness of any statements made by Skylene and Annie to Curran and Hornby has been severely undermined by (1) the youth of the declarants, (2) the sexual abuse experienced by Skylene at the hands of her uncle, and the threats made by the uncle, (3) the suggestive and manipulative use of anatomically correct dolls, (4) the psychological coercion exercised on the children by the interviewers, and (5) the repetitive, systematic and suggestive methods used in interviews in order to obtain the identification of Roy Spotted War Bonnet as the children's abuser. It was therefore improper to admit this hearsay into evidence at trial.

**Expert Testimony**

The defendant was also entitled to the appointment of an expert to evaluate and effectively comment on Dr. Curran's observations, interrogations and evaluations of the children. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 82–83, 105 S.Ct. 1087, 1095–96, 84 L.Ed.2d 53 (1985) (trial court should appoint a psychiatrist to assist a defendant when he demonstrates "that his sanity is likely to be a significant factor in his defense \* \* \*."); *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir.1987) (the determination of whether or not a court-appointed expert is necessary to assist the defense depends upon "how important the \* \* \* issue is in the case, and how much help a defense expert could have given."), *cert. denied*, —— U.S. ——, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). Furthermore, Dr. Curran used anatomically correct dolls during most, if not all, of her interviews with Skylene and Annie. At trial, she gave her evaluation of the children playing with those dolls. Clearly, in allowing this testimony to stand, the defendant was denied due process when he was denied the ap-

pointment of a psychiatrist to examine the children about their use of the dolls. Such an expert could have offered observations and could have made many relevant inquiries. For example: Were the dolls suggestive in and of themselves? Were sexual parts out of proportion so to suggest sexual play?[8] Did the girls use the dolls only upon suggestion or manipulation? In using the dolls did the children truly volunteer names without suggestion? What did the girls do with the dolls? Was their play normal? Were the children particularly prone to suggestion and manipulation due to their relative youth, traumatic experience, and desperate fear of separation from their mother? To urge that an independent expert could not have assisted the defense is unrealistic. Dr. Curran's testimony regarding her interviews with the children was the most damaging evidence brought against the defendant.

## Conclusion

The protection of young children from sexual abuse is certainly a worthy goal. The age of the child often makes these cases difficult to prosecute. However, while the protection of the child is of course an important societal interest, due process of law and the presumption of innocence cannot be waived for those who are accused in sexual abuse cases. The Government's proof must be trustworthy and reliable. The trial court must ensure that the evidence is competent and not subject to suggestion and manipulation. Suggestive pretrial interviews, repeated over and over by experts trained in psychology, cannot rule the day simply because the case involves a young child or because the defendant has been accused of sexual abuse.

The court must assure itself that psychological coercion was not used on the children involved in the case. Before the child testifies, the court must be certain that the testimony is based upon independent recollection and not upon learned behavior developed through repeated, manipulative interviews.

Although prosecution for sexual abuse may be made more difficult by placing limitations on the interviewing procedures of small children utilized by social workers and child psychologists, a careful constitutional balance must be attained. Interviews must be conducted fairly, accurately documented, and observed or recorded if possible to assure that there are no suggestive procedures. In particular, suggestive manipulation of children through the use of anatomically correct dolls should be discarded.

Trial courts must meticulously scrutinize identification procedures. There is always serious potential for suggestion and manipulation of a child's identification of his or her abuser. Such testimony—whether direct or in the form of hearsay—must not be permitted into evidence unless it has been developed through proper identification procedures and the children's ability to accurately recall and relate pertinent events has been established. An indictment for child sexual abuse should not be a justification in itself to abandon constitutional concerns which must govern *all* criminal proceedings.

I respectfully submit that Roy Spotted War Bonnet is entitled to a new trial.

---

**8.** *See* Feher, *supra,* at 237 n. 67 ("The dolls are seldom anatomically 'correct.' The genitals are often oversized, suggesting to the child that, to please the interviewers, he should have something to say about the genitals.").